IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 25-cr-00194-JLK

UNITED STATES OF AMERICA,

       Plaintiff,

v.

MOHAMMED SABRY SOLIMAN,

       Defendant.

---

## EMERGENCY MOTION TO PRECLUDE REMOVAL OF ESSENTIAL MATERIAL WITNESSES

---

Defendant, Mohammed Sabry Soliman ("Mr. Soliman"), by and through undersigned counsel, hereby respectfully moves the court for an order prohibiting the government from removing his ex-wife and their five children from the United States unless and until this court determines that their presence will not be required during any court proceeding in this case.

### STATEMENT OF CONFERRAL

The defense sought the government's position regarding this motion. Due to the time-sensitive nature of the issues raised, the defense emailed its request for conferral at 5:49 pm on Friday May 1, 2026. The government responded promptly. The government stated that if the defense plans to file the motion before Monday, May 4, the government will provide its position in its response filing.

## INTRODUCTION

The government is considering whether to seek Mr. Soliman's execution in this case. If they choose to pursue the death penalty, Mr. Soliman will need to present testimony from his ex-wife and their children during a sentencing trial. However, while one arm of the executive branch – the Department of Justice – is deciding whether to seek Mr. Soliman's death, another – the Department of Homeland Security – is trying to permanently remove these critical material witnesses from the country.

The Constitution and federal law guarantee that a capital defendant may present his family members' live testimony in mitigation. U.S. Const., Am. V, VI, VIII; 18 U.S.C. § 3005. Relatedly, the government may not use immigration law to prevent material, favorable witnesses from testifying in court. *United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982); *United States v. Fillippi*, 918 F.2d 244 (1st Cir. 1990).

Under the time-sensitive circumstances described below, this Court can and should issue an emergency order prohibiting the government from removing Mr. Soliman's ex-wife and children from the United States and that order should remain in effect unless and until this court determines that their presence will not be required during any proceeding in this case.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Mr. Soliman and his Family Move to the United States in 2022.

Mr. Soliman, his now ex-wife,[1] and their five children lawfully moved from Kuwait to the United States on August 27, 2022. In addition to Mr. Soliman, the members of the family and their current ages are: Hayam Salah Alsaid Ahmed El Gamal ("Ms. El Gamal") (46), Habiba Mohamed Sabry Farag Soliman ("Habiba") (18), O.S. (16), H.S. (9), A.S (5), and E.S. (5). A.S. and E.S. are

---

[1] Mr. Soliman and Ms. El Gamal divorced in April 2026.

twins. All five children were born in Kuwait, but are Egyptian citizens because their parents are Egyptian citizens. They were all lawfully admitted to the United States pursuant to B-2 visitor visas authorizing them to stay in the United States through February 26, 2023. Ex. A.

Shortly after their arrival, Mr. Soliman completed a Form I-589 for the entire family, which is an application for asylum and withholding of removal. On February 6, 2023, United States Citizenship and Immigration Services (USCIS) sent Mr. Soliman an "Acknowledgement of Receipt" of his I-589 application for the family that stated, "You may remain in the U.S. until your asylum application is decided." Ex. B.

Mr. Soliman also applied for employment authorization by submitting a Form I-765. USCIS approved that application and issued Mr. Soliman a work permit on March 29, 2023. Ex. C, D. On April 14, 2023, Mr. Soliman obtained a Colorado Driver's License. Ex. E. On June 9, 2023, Ms. El Gamal obtained employment authorization as well. Ex. F.

At the same time, Ms. El Gamal, who worked as an educator and information technology specialist in Kuwait, began working on a petition for a National Interest Waiver (NIW). An NIW allows certain foreign professionals to self-petition for a type of green card known as Employment-Based Permanent Residence (EB-2 Visa).

The Soliman family lived in a two-bedroom apartment in Colorado Springs. Mr. Soliman worked in a variety of difficult, low-paying jobs, including food delivery and rideshare driving. Ms. El Gamal took care of the young twins, studied English, and worked on the family's various immigration applications. From 2022-24, Habiba, O.S., and H.S. attended Thomas MacLaren School, a K-12 public charter school. From August 2024 through May 2025, O.S. attended a boarding school, but Habiba and H.S. remained at MacLaren.

3

In May of 2025, Habiba graduated high school with near-perfect grades. After volunteering in healthcare clinics throughout high school, she planned to attend college on a pre-med track and eventually apply to medical school. She won a "Best and Brightest" scholarship for penning an essay about her immigration story to the United States. Over the three years they had spent in the U.S., the Solimans became part of their community, performed acts of public service, learned English, paid taxes, worked legally, and lawfully sought to adjust their immigration status.

## II.    Mr. Soliman and his Family are Taken into Custody on June 1, 2025.

On June 1, 2025, in an act that was profoundly inconsistent with his prior conduct, Mr. Soliman assembled, lit, and threw two Molotov cocktails in the direction of a group of people standing near the historic Boulder Courthouse along the Pearl Street pedestrian mall. These peaceful demonstrators were gathering to advocate for the release of hostages held by Hamas since October 7, 2023. Mr. Soliman's actions injured at least ten people and caused the death of one person. These events came as a total shock to his family; he had said nothing to anyone of a plan to commit this or any other crime.

Mr. Soliman was charged in state and federal court for his actions. Hours after Mr. Soliman's arrest, federal and state law enforcement agents questioned Ms. El Gamal, Habiba, and Omar. All three cooperated with the law enforcement investigation into Mr. Soliman. That night, federal agents brought the family to a hotel, where they stayed for two days while agents searched their home.

On June 3, 2025, the Department of Homeland Security (DHS) took Ms. El Gamal and all five children into immigration custody. Immigration and Customs Enforcement (ICE) agents flew the family to Texas, where they were detained at the South Texas Family Residential Center in Dilley, Texas. Earlier on June 3, the White House posted on X, "Six One-Way Tickets for

Mohamed's Wife and Five Kids. Final Boarding Call Coming Soon. Wife and Kids of Illegal Alien Behind Antisemitic Firebombing Could be Deported by Tonight."[2]  The next morning, then-DHS Secretary Kristi Noem released the following statement: "This terrorist will be prosecuted to the fullest extent of the law. We are investigating to what extent his family knew about this heinous attack, if they had knowledge of it, or if they provided support to it."[3]

Counsel is aware of no evidence of, nor any ongoing investigation into, the family's knowledge, support, or involvement in the crimes charged against Mr. Soliman. An FBI Agent was asked during Mr. Soliman's preliminary hearing if the family "expressed shock" at what they learned about Mr. Soliman's involvement, and he responded, "That's correct." ECF 30 at 44. When asked if it was true that there was no evidence that the family "had any inkling at all that [Mr. Soliman] was planning to do this or even thinking about doing anything like this," the Agent again answered, "That's correct." *Id*. After being detained, the family sat for multiple interviews with the FBI, lasting several hours. They answered every question honestly and completely, provided access to their electronic devices, and asked for nothing in return.

On June 4, 2025, defense counsel for Mr. Soliman sent a letter to AUSA Melissa Hindman asking the government to prevent the removal of Mr. Soliman's family because removing the family would violate Mr. Soliman's right to due process and compulsory process under the Fifth and Sixth Amendments of the Constitution. Ex. G.

On August 27, 2025, Mr. Soliman offered to plead guilty in the federal case and accept a sentence of life in prison. The government has not decided whether to accept Mr. Soliman's offer because it is considering whether to pursue the death penalty against him.

---

[2] https://x.com/WhiteHouse/status/1930002225860133080 (Accessed May 2, 2026)
[3] https://www.dhs.gov/news/2025/06/04/secretary-noem-announces-ice-detains-boulder-terrorist-solimans-family (Accessed May 2, 2026)

In the state case, Mr. Soliman will plead guilty to all charges on May 7, 2026. The Boulder County District Court will be required to impose prison sentences of Life Without Parole, plus at least 400 years, based on his guilty pleas.

### III.     The Government Repeatedly Attempts to Remove the Family.

After the White House tweets on June 3, 2025, immigration lawyers for the family filed an emergency application for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 and a Temporary Restraining Order (TRO). *Dvortsin v. Noem, et. al.,* D. Colo. 25-cv-01741-NYW (ECF 1). The Court granted the TRO on June 4, stopping the government's attempt at expedited removal. *Id.,* ECF 5. The government eventually conceded that the family was not eligible for expedited removal and immediately began conventional removal proceedings. *Id.*

The family sought release on bond through immigration court in Texas. On September 19, 2025, the Immigration Judge granted bond. However, DHS obtained a stay of the release order while appealing the bond order to the Board of Immigration Appeals (BIA). In response, the family filed a petition for a Writ of Habeas Corpus in the Western District of Texas, seeking an order directing the government to release them pursuant to the bond order. *El Gamal, et. al., v. Noem, et. al.,* W.D. Tex. 25-cv-01618 (ECF 1). On November 28, 2025, the BIA remanded the case back to immigration court for further testimony from Ms. El Gamal and Habiba. This time, the Immigration Judge changed his mind and detained the family pending a decision on their asylum application.

On December 29, 2025, a different Immigration Judge conducted the final hearing on the family's asylum application. Prior to this hearing, the family's attorney sought a continuance because a health issue rendered her unavailable. The immigration judge denied the continuance, leaving the family unrepresented for this important hearing. That judge denied their asylum claim

6

through a practice known as "pretermission."[4] The family appealed this order to the BIA and remained at the Dilley Detention Facility.

On April 20, 2026, a magistrate judge in the Western District of Texas recommended that the family's Writ of Habeas Corpus be granted and the family released. *El Gamal v. Noem,* W.D. Tex. 25-cv-01261-FB-ESC (ECF 59). The District Court set a hearing for April 23, 2026, to decide whether to adopt the magistrate's recommendation. *Id.* (ECF 60). The day before that hearing, the BIA summarily dismissed the family's asylum appeal.[5] On April 23, 2026, the District Court ordered the family released. *Id.* (ECF 69).

The family was finally released on bond on April 23, after 10 months and 3 weeks in custody. They traveled from Dilley to their sponsor's home in Colorado Springs the next day. As directed, they reported to the ICE office in Denver on April 25. At that meeting, ICE agents arrested the family again, drove them to the Denver airport and forced them onto a plane bound for a small airport in Michigan.

While the family flew, their immigration lawyers filed Writs of Habeas Corpus and Emergency Motions for TROs in three Federal District Courts – the Western District of Texas, the District of Colorado, and in the District of Michigan. The District of Colorado granted the TRO, ordering that DHS "shall not remove" the family unless its order is vacated. *El Gamal, et. al. v.*

---

[4] In April 2025, the Executive Office for Immigration Review (EOIR) issued a policy memorandum (PM 25-28) encouraging immigration judges to "pretermit," or deny, asylum applications without addressing the merits of the application based on any perceived deficiency in the application. This practice contradicts the Code of Federal Regulations, which requires that incomplete asylum applications be either returned to the applicant within 30 days to allow the applicant to correct the deficiencies and re-submit, or deemed complete. *See* 8 C.F.R. 1208.3(c)(3).

[5] The attorneys for the family allege in a petition that they learned from a credible source in the Executive Branch that "political leadership in Washington, D.C. ordered the Board of Immigration Appeals to issue a decision in the then-pending removal case appeal before the District Court's April 23rd hearing." *El Gamal, et. al. v. Mullins, et. al.*, D. Colo. 26-cv-01763-NWY (ECF 1, at 2-3). The family has appealed the BIA's order to the Fifth Circuit. *See El Gamal v. Blanche*, Appeal No. 26-60288 (5th Cir. 2026).

*Mullins, et. al.*, D. Colo. 26-cv-01763-NYW (ECF 7). The Western District of Texas also issued a stay of removal. *El Gamal v. Noem,* W.D. Tex. 25-cv-01261-FB (ECF 75, 76).

By this time, the family had landed in Michigan and taken off again, now bound for New Jersey, en route to an undisclosed international location. Based on the court orders, the plane turned around in mid-air and brought the family back to Denver. The family returned to their approved residence in Colorado Springs in the early morning hours of April 26.

Immediately, the government asked the Western District of Texas and District of Colorado to dissolve their stays of removal. *El Gamal v. Noem*, W.D. Tex. 25-cv-01261 (ECF 76); *El Gamal v. Mullins*, D. Colo. 26-cv-01763 (ECF 25). On May 1, the Western District of Texas dissolved its stay. *El Gamal v. Noem*, W.D. Tex. 25-cv-01261 (ECF 76). The District of Colorado has given the family's immigration lawyers until May 4 to reply to the government's request to terminate that case. *El Gamal v. Mullins*, D. Colo. 26-cv-01763 (ECF 24). Until then, that Court's stay is the only order preventing the family's removal.

**IV.    The Family Has Evidence, Not Available From Any Other Source, That Would Be Material and Favorable to Mr. Soliman During a Trial and Capital Sentencing Proceeding.**

The facts establishing the importance of the family's anticipated trial testimony should remain confidential, but available to the government, as much of this information is subject to this Court's Second Amended Protective Order (ECF 76). *See* Restricted Supplement to Emergency Motion to Preclude Removal of Essential Material Witnesses, and all exhibits thereto.

**LEGAL AUTHORITY AND ARGUMENT**

I.      **If This Case Proceeds to a Capital Sentencing Trial, Mr. Soliman Will Have a Constitutional and Statutory Right to Present Live, In-Person Testimony From His Nuclear Family Members.**

"[A]t a minimum, … criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial… Few rights are more fundamental than that of an accused to present witnesses in his own defense. Indeed, this right is an essential attribute of the adversary system itself." *Taylor v. Illinois*, 484 U.S. 400, 408 (1988) (internal citations omitted).

Nowhere is this long-standing principle more important than in a capital sentencing trial. The Eighth Amendment and the Federal Death Penalty Act both require that a capital jury consider, "as a mitigating factor, any aspect of a defendant's character or record … that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); 18 U.S.C. § 3592(a)(8). The Constitution protects the right to present capital mitigation evidence through the Fifth and Sixth Amendments. U.S. Const. Am. V (no person "shall…be deprived of life…without due process of law."); Am. VI ("In all criminal prosecutions, the accused shall enjoy the right…to have compulsory process for obtaining witnesses in his favor."); *see also, Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (through these provisions, "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'") (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).

The Eighth Amendment also imposes a "heightened need for reliability" in capital sentencing proceedings. *Caldwell v. Mississippi*, 472 U.S. 320, 340 (1985); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). To safeguard that heightened need for reliability, the Eighth Amendment entitles a capital defendant to introduce the "most expansive" range of mitigating

evidence, whether or not that evidence has a nexus to the capital offense. *See, e.g., Tennard v. Dretke*, 542 U.S. 274, 284-85 (2004). Only when the jury is able to consider the full range of a defendant's mitigating evidence and "express[ ] its reasoned moral response to that evidence in rendering its sentencing decision" can courts "be sure that the jury has treated the defendant as a uniquely individual human being and has made a reliable determination that death is the appropriate sentence." *Penry v. Johnson*, 532 U.S. 782, 797 (2001).

Unsurprisingly, given the foundational nature of these rights, Congress has codified them. Under federal law,

> Whoever is indicted for [a] capital crime shall be allowed to make his full defense by counsel… [and] shall be allowed, in his defense to make any proof that he can produce by lawful witnesses, and shall have the like process of the court to compel his witnesses to appear at his trial, as is usually granted to compel witnesses to appear on behalf of the prosecution.

18 U.S.C. § 3005. This statute, through its final clause, compels symmetry in access to witnesses between the defense and prosecution in a capital case.

## II.    Mr. Soliman's Ex-Wife and Children Have Material, Favorable, and Irreplaceable Mitigation Evidence.

Here, Mr. Soliman seeks to preserve the opportunity to present live, in-person testimony from his nuclear family. His ex-wife and children, with whom he lived up until his arrest for the charged offenses, would provide testimony no one else can. *See Restricted Supplement*.

The Supreme Court has consistently characterized this type of mitigation evidence as fundamental to the sentencing determination. *See, e.g. Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, 'evidence about the defendant's background and character is relevant.'") (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)). In fact, background and character evidence that only close family members can offer has been deemed so critical to

capital sentencing that Courts have vacated death sentences imposed by juries who lacked such testimony. *See, e.g., Porter v. McCollum*, 558 U.S. 30, 40 (2009) (counsel was ineffective for failing to develop and present evidence of the defendant's "family background"); *Wiggins v. Smith*, 539 U.S. 510, 516 (2003) (same).

Mr. Soliman also has the right to present this testimony through live, in-person witnesses, as opposed to recorded deposition or video teleconference. As this Court and every trial lawyer knows, live, in-person testimony is superior to all other forms of testimonial evidence. Courts have long recognized that live testimony is preferable to other forms of testimonial evidence. *See, e.g., DiRienzo v. Philip Services Corp.*, 294 F.3d 21, 30 (2d Cir. 2002); *United States v. Gigante*, 166 F.3d 75, 80-81 (2d Cir. (1999) (video teleconferencing "should not be considered a commonplace substitute for in-court testimony by a witness"); *United States v. Int'l Bus. Machines Corp.*, 90 F.R.D. 377, 381 (S.D. N.Y. 1981) ("There is a strong preference for live testimony, long recognized by the courts."). Having presided over trials involving video teleconference testimony, one United States District Court Judge observed:

> We are used to looking at screens, in our bedrooms and living rooms, our offices, the train station, in restaurants. The court, however, is different as seen with 'the formality that attaches to the ceremony, the robed judge, the witness' oath, the public's scrutiny, the creation of an appellate record formed in a moment experienced simultaneously by all parties.'

Hon. Nancy Gertner, U.S. District Court Judge for the District of Massachusetts (1994-2011), *Videoconferencing: Learning Through Screens*, 12 Wm. & Mary Bill of Rights J. 769, 784 (2004) (quoting *United States v. Nippon Paper Indus. Co.*, 17 F. Supp. 2d 38, 40 (D. Mass. 1998)).

The Rules of Criminal and Civil Procedure reflect this reality as well. For example, while Rule 15 allows for depositions in criminal cases, it limits that procedure to "exceptional circumstances." Fed. R. Crim. P. 15(a)(1). Similarly, according to the Civil Procedure Rules

11

Advisory Committee, "[t]he very ceremony of trial and the presence of the factfinder may exert a powerful force for truthtelling. The opportunity to judge the demeanor of a witness face-to-face is accorded great value in our tradition." Adv. Comm. Note to 1996 Amendment to Fed. R. Civ. P. 43.

If a need for heightened reliability is to guide the presentation of capital sentencing evidence, Mr. Soliman must be permitted to make his case for life in the most compelling, effective manner available. In this case, that includes the presentation of live, in-person testimony from his closest family members.

III.    **This Court Has the Authority and Obligation to Order the Government Not to Remove These Critical Witnesses Unless and Until the Court Determines Their Presence Will Not Be Required at Any Future Potential Proceeding in This Case.**

"Sanctions may be imposed on the Government for deporting witnesses only if the defendant makes a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 873 (1982). The sanction referenced in *Valenzuela-Bernal* was dismissal of all charges. *Id*. at 863 (Court of Appeals decision under review was that "respondent's motion to dismiss the indictment should have been granted by the District Court.").

If a District Court can dismiss an indictment *after* the government deports a defense witness with material, favorable, non-cumulative testimony, surely it has the authority to prevent that drastic outcome by prohibiting the deportation in the first place. The Supreme Court alluded to that power throughout *Valenzuela-Bernal*. For example, the Court noted that "the Government had good reason to deport respondent's [witnesses] once it concluded that they possessed no evidence relevant to the prosecution or the defense of respondent's criminal charge." *Id*. at 866. The Court

continued, describing the circumstance in which a defendant may make the required showing of materiality in *prospective* terms:

> …while a defendant who has not had an opportunity to interview a witness may face a difficult task in making a showing of materiality, the task is not an impossible one. In such circumstances, it is of course not possible to make an avowal of *how* a witness may testify. But the events to which a witness might testify, and the relevance of those events to the crime charged, may well demonstrate either the presence or absence of the required materiality.

*Id*. at 871 (emphasis original). This reasoning assumes the defendant will be given a chance to describe his/her need for the deportable witness to the trial court *before* the witness is removed. And of course, such an opportunity would be meaningless unless the trial court has the authority to prevent the witness's removal if the requisite showing is made.

"It is always in the public interest to prevent the violation of a party's constitutional rights," as opposed to attempting to remedy the violation after the fact. *Free The Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 807 (10th Cir. 2019). This is especially true here, where removing Mr. Soliman's family from the United States will prevent the defense from serving them with enforceable testimonial subpoenas and lead to costly, extensive litigation surrounding their return for trial. *See* 28 U.S.C. § 1783(a) (limiting federal testimonial subpoenas for witnesses outside the U.S. to American citizens or residents); *United States v. Saipov*, S.D. N.Y. 17-cr-00722 (ECF 181, 184, 209, 217, 232, 233, 267, 311); *United States v. Muhtorov*, D. Colo. 12-cr-00033 (ECF 1329, 1332, 1333, 1334, 1335, 1338, 1339, 1349, 1389, 1392, 1396, 1397, 1404, 1429, 1492).

"Where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." *Bell v. Hood*, 327 U.S. 678, 684 (1946). In other words, a Federal Court's inherent authority includes the power to prevent violations of a party's constitutional rights. This principle appears in every

corner of American jurisprudence. For example, the Supreme Court "long ago recognized that federal injunctive relief against a state court proceeding can in some circumstances be essential to prevent great, immediate, and irreparable loss of a person's constitutional rights." *Mitchum v. Foster*, 407 U.S. 225, 242 (1972) (citing *Ex Parte Young*, 209 U.S. 123 (1908)). In a prisoner's rights dispute, the Tenth Circuit held that "[f]ederal courts have long exercised the traditional powers of equity, in cases within their jurisdiction, to prevent violations of constitutional rights." *Simmat v. Bureau of Prisons*, 413 F.3d 1225, 1231-32 (10th Cir. 2005). Even the basic right to sue federal officials for violating one's constitutional rights rests on the "presumed availability of federal equitable relief, if a proper showing can be made in terms of the ordinary principles governing equitable remedies." *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 400 (1971) (J. Harlan, concurring).

Separate from this Court's inherent authority and obligation to protect Mr. Soliman's Fifth, Sixth, and Eighth Amendment rights, the law provides a mechanism to ensure his family's availability to testify at trial. Because they are material witnesses, this court can order their arrest and immediate release pursuant to minimal conditions under 18 U.S.C. § 3144, which states:

> If it appears from an affidavit filed by a party that the testimony of a person is material in a criminal proceeding, and it is shown that it may become impracticable to secure the presence of the person by subpoena, a judicial officer may order the arrest of the person and treat the person in accordance with the provisions of section 3142 of this title.

18 U.S.C. § 3144.

After everything they have been through at the hands of the government, Mr. Soliman's family should not be detained pursuant to § 3144. Minimal release conditions will reasonably assure their appearance as required and none of these individuals have ever, or will, endanger the safety of any other person or the community. *See* 18 U.S.C. § 3142(c) (requirements for release

14

under the Bail Reform Act). However, § 3144 provides yet another legal basis for this Court to intervene before the government deports these critical witnesses. Perhaps more importantly, § 3144 underscores the principle that one key role of the trial court is to ensure the parties' access to material witnesses in criminal cases.

## CONCLUSION

The United States Government has made its intentions abundantly clear: it will never give up its effort to deport Mr. Soliman's ex-wife and children. If the government removes these key witnesses and seeks the death penalty against Mr. Soliman, the ensuing proceedings will violate Mr. Soliman's Fifth, Sixth, and Eighth Amendment rights. This Court must protect those rights, and the integrity of these proceedings, by preventing this problem before it happens. It has the power, duty, and obligation to do so and for the reasons explained above, must act quickly to exercise that authority. The defense submits a draft order, attached hereto as Ex. H.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

s/ David Kraut
DAVID KRAUT

s/ Jennifer Beck
JENNIFER BECK

s/ Kelly Christl
KELLY CHRISTL

Assistant Federal Public Defenders
633 17th Street, Suite 1000
Denver, CO  80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email: David_Kraut@fd.org
Email: Jennifer_Beck@fd.org
Email: Kelly_Christl@fd.org
Attorneys for Defendant

16

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2026, I filed the foregoing *Emergency Motion to Preclude Removal of Essential Material Witnesses* with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email addresses:

Melissa E. Hindman, Assistant United States Attorney
Email:  melissa.hindman@usdoj.gov

Sarah E. Howard, Assistant United States Attorney
Email: sarah.howard2@usdoj.gov

I hereby certify that I have mailed or served the document or paper to the following participant in the manner (mail, hand-delivery, etc.) indicated next to the participant's name:

Mohammed Sabry Soliman (via U.S. mail)

s/ David Kraut
DAVID KRAUT
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email: David_Kraut@fd.org
Attorney for Defendant