IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 25-cr-00194-JLK

UNITED STATES OF AMERICA,

       Plaintiff,

v.

MOHAMMED SABRY SOLIMAN,

       Defendant.

---

## REPLY TO GOVERNMENT'S RESPONSE TO MR. SOLIMAN'S EMERGENCY MOTION TO PRECLUDE REMOVAL OF MATERIAL WITNESSES

---

Defendant, Mohammed Sabry Soliman ("Mr. Soliman"), by and through undersigned counsel, hereby respectfully replies to the government's response to his Emergency Motion to Preclude Removal of Material Witnesses (ECF 94).

### INTRODUCTION

The government opposes Mr. Soliman's motion (ECF 87) on three grounds. First, they argue that this Court lacks jurisdiction to preclude the removal of Mr. Soliman's ex-wife and children. Second, they claim Mr. Soliman has no right to in-person testimony from critical mitigation witnesses at a capital sentencing proceeding. And third, the government alleges that various alternatives to preventing the removal of these witnesses will suffice. On each front, the government is wrong.

### I.    The Government's Jurisdictional Argument Relies on Inapposite Immigration Cases.

The government cites a series of statutes and cases relating to judicial review of removal orders to support its claim that this Court lacks the jurisdiction to order that critical mitigation

witnesses remain in the United States pending a possible capital trial. Reliance on these authorities is misplaced for one simple reason: Mr. Soliman does not ask this Court to review his family's removal orders.

For example, the government notes that only the 5th Circuit Court of Appeals may "review [the] decisions and actions leading up to or consequent upon final orders of deportation" lodged against Mr. Soliman's family. ECF 94, at 7. Whether this is true is a question for immigration lawyers, not the parties to this case. Regardless, Mr. Soliman is not asking this court to "review" any decision relating to their removal orders. He is asking this Court to protect his rights, not the rights of his family members. He does not ask this court to review any aspect of the legal determinations made by the Immigration Judge or Board of Immigration Appeals. He simply asks this Court to manage his criminal case in a way that will protect his rights if (or, as the government puts it, "if and when"[1]) his life depends on it.

The government next cites to 8 U.S.C. § 1252(g), which states that only the appropriate court of appeals "shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from" a decision under the Immigration and Nationality Act ("INA"). ECF 94 at 7. This may be true, but this Court has not been presented with any such cause or claim. The request presented is raised by and on behalf of Mr. Soliman, not his family.

---

[1] ECF 94, at 10. Despite the government's insistence that it has "been diligently following the procedures set out in the Justice Manual…to determine whether seeking the death penalty is appropriate," the language of its Response suggests that seeking Mr. Soliman's death is a forgone conclusion. ECF 94, at 3; *cf. id., at* 6 (stating the government has "not yet" decided to seek the death penalty). The defense has not presented argument for a life sentence to the local prosecution team or the DOJ's Capital Review Committee. To be sure, the government should recognize that a life sentence is sufficient and resolve the case accordingly. However, for the purpose of the instant motion, the Court should assume that these witnesses will in fact be needed.

The cases cited by the government relating to § 1252(g) are all immigration cases, not criminal cases. *See, e.g., Sharif v. Ashcroft*, 280 F.3d 786 (7th Cir. 2002) (federal district court lacked jurisdiction to grant aliens' habeas petition seeking to stop their own removal); *Van Dinh v. Reno*, 197 F.3d 427 (10th Cir. 1999) (federal district court lacked jurisdiction over aliens' *Bivens* suit seeking to prevent their transfer to distant detention facilities)[2]; *Namgyal Tsering v. I.C.E.*, 403 Fed. Appx. 339 (10th Cir. 2010) (federal district court lacked jurisdiction over alien's habeas petition alleging removal to the wrong country based on inaccurate documents); *McCloskey v. Keisler*, 248 Fed. Appx. 915 (10th Cir. 2007) (Tenth Circuit lacks jurisdiction to review ICE's discretionary refusal to defer alien's removal); *Fiallo v. Bell*, 430 U.S. 787 (1977) (Congress lawfully withheld preferential immigration status from illegitimate fathers based on the status of their biological children, and vice versa)[3].

The government repeatedly asserts that 8 U.S.C. § 1252 creates an "exclusive grant of jurisdiction." ECF 94 at 8. That statute does create an exclusive grant of jurisdiction, just not one as broad as the government would like. Section 1252 identifies which courts may review certain

---

[2] This Court presided over *Van Dinh*. In that case, detained aliens filed a habeas petition to prevent INS from moving them from a Denver-area detention center to far-flung jails. Leading up to a hearing on that petition, INS officials promised not to move any alien with matters pending before the federal court outside the Denver area and promised to return any alien to Colorado if his/her presence is required by any federal court. *Van Dinh*, 197 F.3d at 429. The plaintiffs then filed a *Bivens* suit seeking to prevent their transfer. While the *Bivens* suit was pending, the INS signed a new contract with the Denver-area detention center and dropped its plans to move the detainees, mooting the plaintiffs' claims. The plaintiffs agreed to dismiss the *Bivens* suit, but requested attorney fees. The case reached the Tenth Circuit solely because the plaintiffs appealed this Court's denial of attorney fees, an order the Circuit affirmed. Based on these unique circumstances, which have nothing in common with this case, *Van Dinh* does not control the question presented in the instant matter.

[3] *Fiallo* "underscore[d] the limited scope of judicial inquiry into immigration legislation." 430 U.S. at 792. Mr. Soliman does not ask this Court to review the constitutionality of an immigration law.

immigration decisions. It says nothing of this Court's jurisdiction, authority, and duty to manage its criminal case in accordance with the Constitution.

II.    **If the Government Seeks the Death Penalty, Mr. Soliman Must Be Allowed to Present In-Person Mitigation Testimony From His Family Members, Who Are Currently on Immigration Bond in Colorado.**

The government claims that Mr. Soliman's "assertion that he has a constitutional or statutory right to live, in-person testimony is incorrect." ECF 94 at 2. In support, they cite to *Saipov*, in which the district court repeatedly ordered the government to assist in obtaining Significant Public Benefit Parole ("SPBP") for Mr. Saipov's non-citizen family members. Those witnesses were not in the United States when the case was pending but were ultimately admitted to the country to testify for the defense. The *Saipov* court never had the opportunity to prevent their removal. Instead, it had the opportunity to try to ensure their presence, and it did so.

While it is true that the *Saipov* district court held that "the case law on which [Saipov] relies does not establish a constitutional right to present live, in-person testimony," that holding does not control this Court's ruling on Mr. Soliman's motion. *United States v. Saipov*, 412 F.Supp.3d 295, 299 (S.D. N.Y. 2019). Further, the *Saipov* court's commitment to ensuring the in-person testimony of Mr. Saipov's family underscores the trial court's critical role as protector of a capital defendant's opportunity to present in-person mitigation testimony.

The government also highlights the *Saipov* court's citation to two federal capital prosecutions in which alternatives to live, in-person mitigation testimony were deemed necessary. Neither of those cases involved witnesses who were in the United States and could testify if not removed. More importantly, the circumstances forcing those courts to find alternatives to live, in-person mitigation testimony are not present in this case.

In the first of these cases, *United States v. Tsarnaev*, the defendant's relative could not obtain permission to enter the United States, so he testified via closed circuit television from the U.S. Embassy in Kazakhstan. In the second, *United States v. Massaoui*, the defense sought testimony from three people in U.S. military custody who were detained abroad in secret locations and had been designated enemy combatants. For national security reasons, these witnesses could not be made available to testify in-person at Massaoui's trial. The court allowed the defense to present written summaries and testimony from other witnesses in lieu of bringing these people into the country for the trial.

The *Saipov* court cited those examples to support its finding that Saipov lacked a constitutional right to present live, in-person testimony. However, neither the *Saipov*, *Tsarnaev*, nor *Massaoui* case prevents this Court from ordering that Mr. Soliman's family not be removed. Each of those cases presented unique factual circumstances that do not exist in this case. Based on those unusual circumstances, those courts had to make exceptions to the general rule that witnesses testify in person. In the absence of such circumstances, this Court need not, and should not, make such an exception.

### III.    The Alternatives Proposed By the Government Are Insufficient to Protect Mr. Soliman's Fifth, Sixth, and Eighth Amendment Rights.

The government proposes a series of alternatives to in-person testimony. They suggest material witness warrants, pre-trial depositions, and remote live testimony via video teleconference. They also offer to work with the defense to pursue SPBP for Mr. Soliman's family in the future. None of these alternatives would be sufficient to protect Mr. Soliman's Fifth, Sixth, and Eighth Amendment rights. In addition, none are preferable to ordering that Mr. Soliman's family remain in the United States pending further order of this Court.

In-person testimony is the most effective manner of presenting mitigation in a capital sentencing trial. Mr. Soliman's Motion offered several sources of authority for this fundamental concept. Mr. Soliman asserts that the information already submitted in support of his motion establishes that the government's proposed alternatives will not sufficiently replace his family's in-person testimony at a capital sentencing trial. However, if the Court is inclined to entertain the government's arguments that one or more of these alternatives may suffice, Mr. Soliman respectfully requests the opportunity to present testimony and evidence at a hearing before this Court to show they will not. Such testimony would come from capital mitigation specialists, capital defense lawyers, and/or capital jury analysts. Preparation for such a presentation would require a 2-3 month continuance of the hearing on this motion.[4]

Even without such evidence, the government's proposed alternatives fall short. For example, issuing warrants for Mr. Soliman's family under 18 U.S.C. § 3144 would not ensure their availability at a sentencing trial. This is because § 3144 directs courts to consider release pursuant to the Bail Reform Act ("BRA"). And the BRA would require the release of Mr. Soliman's ex-wife and children, who present no risk of volitional flight and no danger to the community. Once released, they would be removed, just as any person subject to removal who is arrested and released.

Rule 15 depositions today cannot account for the evidence that will be presented at trial. If the government seeks Mr. Soliman's death, his trial and any potential sentencing trial would not occur for several years. At this time, there is no way to know the evidence the government will

---

[4] If the Court continues the hearing to allow Mr. Soliman (or the government) to present expert testimony and evidence, it should also order that the Executive Branch shall not remove Mr. Soliman's family members until the conclusion of the hearing and issuance of an order on Mr. Soliman's motion.

present in alleged aggravation. The government has not filed an Indictment listing special circumstances, the parties have not litigated the production of an informational outline, and the parties have not litigated any of the many questions regarding sentencing trial evidence that would necessarily arise. Under these circumstances, a deposition in the dark, before defense counsel can know the nature of the sentencing trial evidence, does nothing to ensure a meaningful opportunity to present mitigation.

In addition, depositions would create an unprepared snapshot of Mr. Soliman's family on the heels of the most traumatizing events of their lives. Less than a month ago, they reentered society after more than ten months in jail. During that time, one child suffered a medical episode that became life-threatening due to the facility's neglect, another developed severe dental problems for which she received no care, and Ms. El Gamal suffered extreme physical pain and anxiety related to a growth on her chest and fluid around her heart, all of which was ignored. The oldest child was separated from her entire family for months. They have had no opportunity to process their trauma, let alone prepare to address a jury that holds Mr. Soliman's life in its hands.

Under the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, the decision to present testimony to a capital sentencing jury can only occur after "an ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record…[and] any other factors which may provide a basis for a sentence less than death."[5] That investigation requires the defense team to "conduct in-person, face-to-face, one-on-one interviews with…the client's family… Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation.

---

[5] "Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases," 36 Hofstra L. Rev. 677, 689 (2008), attached as Ex. A.

[Defense] [t]eam members must endeavor to establish the rapport with the…witnesses that will be necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceeding." *Id*. Due to Mr. Soliman's family's incarceration, counsel has been unable to conduct the tasks necessary to prepare this aspect of the case. Deposing these witnesses today would capture Mr. Soliman's family's perspective at a moment of unprecedented dysregulation in their lives. And presenting such unprepared testimony to a future jury would violate the core mitigation functions of defense counsel.

The offer of live video testimony assumes Mr. Soliman's family will end up in a place where they can and will testify when needed. However, as the government knows, they sought asylum. Mr. Soliman's ex-wife has alleged legitimate, genuine fear for her and her children's safety and freedom if they are sent to Egypt.[6] In Egypt, these witnesses will almost certainly be fearful and reluctant to testify for Mr. Soliman's defense. The government makes no effort to address this, nor explains how it will ensure that Mr. Soliman's family remains ready, willing, and able to testify by video teleconference over the next few years.

The Court should also consider research on the impact of video testimony in court proceedings.[7] For example, one 2010 study showed that bail hearings conducted over video produced substantially higher cash bond amounts than those conducted in-person. *Id.* at 2. In 2008,

---

[6] Neither the Immigration Judge nor the Board of Immigration Appeals addressed the merits of this claim; both denied it for procedural reasons alone. Ms. El Gamal's immigration lawyers recently described the bases for her ongoing fear of persecution in Egypt. *See El Gamal v. Trump, et. al.,* D. Colo. 26-cv-1763-NYW, ECF 28 at 11 (section entitled, "Removal would expose Petitioners to severe persecution risk in Egypt."). She fears the Egyptian government will severely mistreat the family due to their connection to Mr. Soliman, their cooperation with American law enforcement, and her status as a divorced woman.

[7] Bannon & Adelstein, *The Impact of Video Proceedings on Fairness and Access to Justice in Court*, Brennan Center for Justice at New York University School of Law (2008), attached as Ex. B.

researchers found that immigration proceedings conducted by video were more likely to result in deportation than those conducted in-person. *Id*. A 2001 study using simulated court proceedings found that when testifying by video, child witnesses in particular "were perceived as less accurate, believable, consistent, and confident." *Id*. This is of particular concern here because Mr. Soliman's children would likely supply some of the most important mitigation evidence in the case.

Finally, the federal prosecutors on this case can try their best to convince DHS to admit Mr. Soliman's family pursuant to SPBP, but there is no reasonable likelihood those efforts will be successful. Recently, a Magistrate Judge for the Western District of Texas summarized the government's approach to Mr. Soliman's family:

> The government has intervened in this case repeatedly and aggressively from its inception… [A]t every subsequent step of this case, the government has relentlessly sought to detain Petitioners through targeted procedural maneuvers and the intimidation of Petitioner's family and community… [T]here is some evidence before the Court that suggests the government improperly interfered in the subsequent custody hearings, too… [T]he targeting of Petitioners [is] for potentially punitive and political purposes.

*El Gamal v. Trump, et al*, D. Colo. 26-cv-1763-NYW, ECF 27 at 4.[8] Based on how DHS has treated this family, it defies logic to assume a request from Denver's AUSAs will cause DHS to grant them parole. Unlike the ICE agents in *Van Dinh*, who promised to bring detainees in their custody to Denver when needed, the AUSAs prosecuting Mr. Soliman have no control over future DHS parole determinations.

---

[8] This habeas petition sets forth additional detail regarding the government's shocking treatment of Mr. Soliman's family and unwavering effort to remove them from the United States. If necessary, Mr. Soliman can and will present evidence establishing these facts, but he would need additional time to prepare for such a presentation. For example, Mr. Soliman could call Ms. El Gamal and O.S. to testify to the information contained in their declarations, filed at ECF 27-3 and 27-4 in 26-cv-1763, and/or Ms. El Gamal's immigration attorney(s) to describe the government's actions in immigration court.

Further, the risks involving the family's future availability for live video testimony apply equally to the government's SPBP proposal. The SPBP process assumes the witnesses are willing and able to engage with the government in the country where they are living and the U.S. government in a complex and demanding process to testify for Mr. Soliman's defense. Based on their immigration pleadings, they would be terrified to do this.

**CONCLUSION**

The government's response first seeks to apply immigration law to this criminal case. There is no basis for such application. Second, the government cites three unusual, highly fact-specific decisions to show that Mr. Soliman lacks the right to present in-person mitigation testimony from his family members. But none of those facts are present here and none of those cases control this Court's decision. Additionally, the government fails to address any of the legal authority cited in Mr. Soliman's motion showing that if the government seeks his death, he will have that right. Finally, the government offers four insufficient alternatives to in-person mitigation testimony.

This Court can and should issue an order preventing the removal of Mr. Soliman's family until further order of the Court. Much of the government's opposition assumes this Court lacks the power to issue such an order. However, the government says nothing of the warning this Court has already issued: "Considering the risk to Mr. Soliman's essential rights, any violation of this Order during its pendency could result in dismissal of the charges in this case." ECF 90 at 2. Clearly, the Court has the authority and duty to safeguard Mr. Soliman's essential constitutional rights. At this juncture, the way to fulfill that obligation is to order the government to wait to remove his family unless and until the Court determines their presence is not needed for this case.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

*s/ David Kraut*
DAVID KRAUT

*s/ Jennifer Beck*
JENNIFER BECK

*s/ Kelly Christl*
KELLY CHRISTL

Assistant Federal Public Defenders
633 17th Street, Suite 1000
Denver, CO  80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email: David_Kraut@fd.org
Email: Jennifer_Beck@fd.org
Email: Kelly_Christl@fd.org
Attorneys for Defendant

11

CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2026, I filed the foregoing ***Reply to Government's Response to Mr. Soliman's Emergency Motion to Preclude Removal of Essential Mitigation Witnesses*** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email addresses:

Melissa E. Hindman, Assistant United States Attorney
Email:  melissa.hindman@usdoj.gov

Sarah E. Howard, Assistant United States Attorney
Email: sarah.howard2@usdoj.gov

I hereby certify that I have mailed or served the document or paper to the following participant in the manner (mail, hand-delivery, etc.) indicated next to the participant's name:

Mohammed Sabry Soliman (via U.S. mail)

*s/ David Kraut*
DAVID KRAUT
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email: David_Kraut@fd.org
Attorney for Defendant
